In the

# United States Court of Appeals

## For the Seventh Circuit

No. 11-3693

CENTER FOR INDIVIDUAL FREEDOM,

*Plaintiff-Appellant*,

*v.*

LISA MADIGAN, Attorney General
of the State of Illinois *et al.*,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:10-cv-04383—**William T. Hart**, *Judge.*

ARGUED APRIL 10, 2012—DECIDED SEPTEMBER 10, 2012

Before POSNER, ROVNER, and HAMILTON, *Circuit Judges.*

HAMILTON, *Circuit Judge.* The Supreme Court's decision
in *Citizens United v. FEC*, 130 S. Ct. 876 (2010), is best
known for striking down as an unconstitutional restric-
tion of free speech the federal law that bans corporations
and labor unions from running campaign-related adver-
tisements in the lead-up to an election. That holding
largely overshadowed another part of the decision up-

holding the same law's campaign finance disclosure provisions. Those provisions require any outside entity or individual spending significant sums in a federal election to file reports with the Federal Election Commission (FEC) identifying the person or group making the expenditure, its amount, and the names of certain contributors. Describing disclosure requirements as a "less restrictive alternative to more comprehensive regulations of speech," the *Citizens United* Court wrote that "prompt disclosure of expenditures can provide shareholders and citizens with the information needed to hold corporations and elected officials accountable for their positions and supporters. . . . The First Amendment protects political speech; and disclosure permits citizens and shareholders to react to the speech of corporate entities in a proper way." *Id.* at 916. Despite this holding, in the aftermath of *Citizens United* a number of suits have been filed challenging federal and state disclosure regulations as facially unconstitutional. Of the federal courts of appeals that have decided these cases, every one has upheld the disclosure regulations against the facial attacks.[1]

---

[1]  See *National Org. for Marriage, Inc. v. Sec'y*, No. 11-14193, 2012 WL 1758607, at *1 (11th Cir. May 17, 2012) (unpublished opinion) (rejecting facial and as-applied challenge to Florida disclosure laws); *The Real Truth About Abortion, Inc. v. FEC*, 681 F.3d 544, 546 (4th Cir. 2012) (rejecting facial and as-applied challenge to FEC disclosure regulations pursuant to Federal Election Campaign Act); *Family PAC v. McKenna*, 685 F.3d 800,

(continued...)

This case involves another such challenge. Plaintiff-appellant Center for Individual Freedom (the Center) seeks to invalidate Illinois disclosure requirements on the grounds that they are facially vague and overbroad restrictions of speech in violation of the First and Fourteenth Amendments. Illinois's disclosure law is modeled on the federal one. It requires groups and individuals that accept "contributions," make "expenditures," or sponsor "electioneering communications" in excess of $3,000 to make regular financial disclosures to the State Board of Elections. See 10 ILCS 5/9-1.8. The Illinois Election Code drew the key definitions of "contribution," "expenditure,"

---

[1] (...continued)

811 (9th Cir. 2012) (rejecting facial challenge to Washington disclosure laws); *National Org. for Marriage v. McKee*, 649 F.3d 34, 41 (1st Cir. 2011) (rejecting facial challenge to Maine disclosure laws); *Human Life of Wash. Inc. v. Brumsickle*, 624 F.3d 990, 994-95 (9th Cir. 2010) (rejecting facial challenge to Washington disclosure laws); see also *Speechnow.org v. FEC*, 599 F.3d 686, 696-98 (D.C. Cir. 2010) (upholding federal disclosure requirements as applied to unincorporated nonprofit association that was required by the FEC to register as a political committee). But cf. *Sampson v. Buescher*, 625 F.3d 1247, 1249 (10th Cir. 2010) (invalidating Colorado campaign finance disclosure requirements as applied to neighborhood group that had raised less than $1,000 to oppose annexation); *New Mexico Youth Organized v. Herrera*, 611 F.3d 669, 671 (10th Cir. 2010) (invalidating New Mexico disclosure requirements as applied to two nonprofit organizations "formed for the purpose of educating young New Mexicans about issues such as healthcare, clean elections, the economy and the environment").

and "electioneering communication" from federal law. The only substantive differences are that the Illinois disclosure requirements (1) cover election activity relating to ballot initiatives, which have no federal analog; (2) do not exempt from regulation those groups that lack the "major purpose" of influencing electoral campaigns; and (3) cover campaign-related advertisements that appear on the Internet. The Center argues that these differences, and a few other terms in the Illinois statute, render its disclosure regime unconstitutionally vague and overbroad on its face.

To prevail in such a facial challenge, a plaintiff must cross a high bar. A statute is facially overbroad only when "it prohibits a substantial amount of protected speech," *United States v. Williams*, 553 U.S. 285, 292 (2008), and unconstitutionally vague only when its "deterrent effect on legitimate expression is . . . both real and substantial." *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 60 (1976) (internal quotation marks omitted). The district court granted the state's motion to dismiss, finding that the Center could not meet these standards. We affirm.

I. *Factual and Procedural Background*

The Center is a Virginia-based § 501(c)(4) nonprofit organization whose stated mission is "to protect and defend individual freedoms and individual rights guaranteed by the U.S. Constitution." To that end, it broadcasts advertisements, maintains a website, publishes a weekly e-mail newsletter, produces a bi-weekly radio

show, and engages in other forms of mass media communications. Its tax exempt status under § 501(c)(4) is incompatible with partisan political activity, so the Center cannot endorse candidates or urge the public to "vote for so-and-so." But apart from a need to avoid such "express advocacy," in the lingo of campaign finance law, the Center and other § 501(c)(4) groups enjoy fairly wide latitude from the IRS. During election seasons, the Center runs advertisements that refer to the positions of candidates or to ballot issues and call on the audience to take actions such as contacting candidates.[2]

The Center wished to engage in similar advocacy during the 2010 elections in Illinois and made plans to address "legal reform and other justice-related issues" in

---

[2] In one TV spot, for instance, the Center criticized West Virginia Attorney General Darrell McGraw during his 2008 reelection campaign:

> Announcer: They say you can't teach an old dog new tricks. Twenty-eight years of controversy and Darrell McGraw is at it again, spending $10 million from a settlement meant to help workers and the elderly — instead, divvying it up between his trial lawyer buddies and a fund only controlled by McGraw. The *Wheeling Intelligencer* said, "Legislators should have put a leash on McGraw long ago." But they say you can't teach an old dog new tricks. Call Darrell McGraw. Tell him to return the people's money.

Dkt. No. 73; *CFIF Launches Public Education Effort in W. Va.*, Youtube, http://www.youtube.com/watch?v=vPMwR2gMNTE (last visited Aug. 29, 2012).

advertisements referring to incumbent officeholders who were candidates. But the Center feared that Illinois's newly-amended campaign finance laws would require it to register as a "political committee" and to disclose its election-related expenditures and its significant contributors. According to the Center, its donors require assurances that their identities will not be disclosed, and this anonymity is a condition of their support. The Center says it had no choice but to forbear from its Illinois "issue advocacy" in 2010, so its political speech was chilled by Illinois's disclosure laws.

These laws are codified in Article 9 of the Illinois Election Code. Article 9 is long and filled with the jargon of contemporary U.S. campaign finance law — "electioneering communications," "independent expenditures," etc. — which we detail in Part IV of this opinion. But Article 9's basic provisions are fairly easy to summarize. Each political committee in Illinois must register with the Board of Elections, maintain records of every contribution received and expenditure made "in connection with" an election, 10 ILCS 5/9-7, and file a report of all such transactions each quarter, 10 ILCS 5/9-10(b). This quarterly report must include the total sums of contributions received and expenditures made in the covered period; accountings of the committee's funds on-hand and investment assets held; and the name and address of each contributor who gave more than $150 that quarter. 10 ILCS 5/9-11(a). In addition to the quarterly report, a political committee must disclose any contribution of $1,000 or more (along with the name and address of the contributor) within five days of

its receipt, or within two days if received 30 or fewer days before an election. 10 ILCS 5/9-10(c). For reporting violations, the Board may issue civil fines of no more than $5,000 for any one group (except in the case of "willful and wanton" violations), or seek to enjoin violators' campaign activities in state court. 10 ILCS 5/9-10.[3]

Candidates' campaign organizations and political parties of course must register as political committees. 10 ILCS 5/9-1.8(b), (c). But so too must outside groups and private individuals if, within any 12-month period, they accept contributions or make expenditures in excess of $3,000 "on behalf of or in opposition to" any candidate or ballot question. 10 ILCS 5/9-1.8(d), (e). Any entity other than a natural person must also register as a political committee if it makes "independent expenditures" of more than $3,000 within one year. 10 ILCS 5/9-8.6(b). Illinois has largely borrowed from federal law its definition of "electioneering communication," which means a radio, television, or Internet broadcast that (1) refers to a "clearly identified" candidate, political party, or ballot issue; (2) is made within two months of a general election or one month of a primary election, (3) is "targeted to the relevant electorate," and (4) is

---

[3] The Board or any political committee may also seek injunctive relief in state court to compel compliance with Board orders or to enjoin an offending committee's operations. 10 ILCS 5/9-23, 5/9-24. Filing false or incomplete information in a campaign finance report may also constitute a "business offense" under the Criminal Code punishable by criminal fine of up to $5,000. See 10 ILCS 5/9-26.

unambiguously an "appeal to vote" for or against a candidate, party, or ballot issue. 10 ILCS 5/9-1.14.[4] Funds spent on electioneering communications that are coordinated with a political committee are treated as contributions to that committee, while uncoordinated electioneering communications are considered independent expenditures. See 10 ILCS 5/9-1.15.

The Center argues that five of Article 9's definitions — "electioneering communications," "political committee," "contribution," "expenditure," and "independent expenditure" — are facially vague and overbroad. In July 2010, the Center brought suit against the Illinois Attorney General and members of the Illinois State Board of Elections in their official capacities, see *Ex parte Young*, 209 U.S. 123 (1908), seeking to invalidate and enjoin Article 9's disclosure requirements as unconstitutional restrictions of free speech. After the district court denied the Center's motion for a preliminary injunction, 735 F. Supp. 2d 994 (N.D. Ill. 2010), and this court denied its request for an injunction pending appeal, the Center's appeal was dismissed by agreement without prejudice. In January 2011, the Center filed an amended complaint containing the same allegations but taking into account changes to Article 9 that took effect on January 1, 2011. The state moved to dismiss, and the Center moved for

---

[4] Article 9 expressly excludes from this definition any "news story, commentary, or editorial distributed through the facilities of any legitimate news organization." 10 ILCS 5/9-1.14(b)(1). The Center does not challenge the reach or applicability of this exemption.

summary judgment. The parties did not dispute any material facts. The district court denied the Center's motion for summary judgment and granted the state's motion to dismiss. This appeal followed.

II. *Standing*

We begin, as we must, with the state's argument that the Center lacks standing to bring a constitutional challenge against Article 9. Although the state did not raise this issue in the district court, standing is a jurisdictional requirement that is not subject to waiver. *United States v. Hays*, 515 U.S. 737, 742 (1995); *National Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 255 (1994).

The standing requirement of Article III is part of the restriction of the federal judicial power to "Cases" and "Controversies." U.S. Const. art. III, § 2; *Arizona Christian School Tuition Org. v. Winn*, 131 S. Ct. 1436, 1441-42 (2011). Constitutional standing imposes three core requirements:

> First, the plaintiff must have suffered an "injury in fact "— an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" Second, there must be a causal connection between the injury and the conduct complained of — the injury has to be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Id.* at 1442, quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)*.*

On appeal, the state contends that the Center lacks standing because it has neither been subject to any past regulation — it has not been ordered to register as a political committee, threatened with sanctions, or named in a Board complaint — nor "demonstrate[d] any proba-bility that its speech will trigger Article 9's registration and reporting requirements" in the future. We construe this argument as a challenge to the Center's injury-in-fact showing. (The state does not question whether the traceability and redressability prongs are satisfied here.)

It is well settled that pre-enforcement challenges to government regulations can be Article III cases or contro-versies. *Bandt v. Village of Winnetka*, 612 F.3d 647, 649 (7th Cir. 2010). A plaintiff "does not have to await the consummation of threatened injury to obtain preventive relief." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979), quoting *Pennsylvania v. West Virginia*, 262 U.S. 553, 593 (1923). To satisfy the in-jury-in-fact requirement in a pre-enforcement challenge, the plaintiff must show only that she faces "a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." *Id.*[5]

---

[5] See also *ACLU of Illinois v. Alvarez*, 679 F.3d 583, 590-91 (7th Cir. 2012) ("To satisfy the injury-in-fact requirement in a preenforcement action, the plaintiff must show 'an intention to engage in a course of conduct arguably affected with a
(continued...)

The injury-in-fact standard is often satisfied in pre-
enforcement challenges to limitations on speech. The
Supreme Court has recognized "self-censorship" as a
distinct "harm that can be realized even without an
actual prosecution." *Virginia v. American Booksellers Ass'n*,
484 U.S. 383, 393 (1988).[6] The chilling of protected speech
may thus alone qualify as a cognizable Article III
injury, provided the plaintiffs "have alleged an actual
and well-founded fear that the law will be enforced
against them." *Id.*

The Center has made this showing. It has a history
of broadcasting messages concerning public policy and
political candidates across the United States. It has alleged
that while it wishes to engage in similar advocacy in
Illinois, it has curtailed its speech because it fears being

---

(...continued)

constitutional interest, but proscribed by a statute, and
[that] there exists a credible threat of prosecution thereunder.' "),
quoting *Babbitt*, 442 U.S. at 298.

[6] See also *Dombrowski v. Pfister*, 380 U.S. 479, 486-87 (1965)
("Because of the sensitive nature of constitutionally protected
expression, we have not required that all of those subject to
overbroad regulations risk prosecution to test their rights. For
free expression of transcendent value to all society, and not
merely to those exercising their rights — might be the loser. . . .
We have fashioned . . . exception[s] to the usual rules gov-
erning standing . . . because of the danger of tolerating, in the
area of First Amendment freedoms, the existence of a penal
statute susceptible of sweeping and improper application.")
(internal citations and quotation marks omitted).

regulated as a political committee. The Center's President submitted an affidavit stating that but for Article 9, his organization would have spoken out during the 2010 Illinois elections using "the typical form of issue ad," that "[f]unding was available," and that its "wish to speak in Illinois remained live." The Center's standard issue advertisements are run during election season, identify an issue of public policy, give concrete examples to "illustrate the policy" using candidates with whom the public is familiar, and call on the audience to take some "action other than voting, e.g. contacting named candidates and encouraging them to continue or embrace the policy." The Center's typical issue ads meet enough of the statutory elements to qualify, at least arguably, as electioneering communications under Illinois law, and the Center would easily pass the $3,000 registration threshold. The Center's self-censorship was based on an objectively reasonable, "actual[,] and well-founded fear that the law will be enforced against" it. *American Booksellers*, 484 U.S. at 393.

The state asserts that *Wisconsin Right to Life, Inc. v. Paradise*, 138 F.3d 1183 (7th Cir. 1998), shows that the Center lacks a sufficiently well-founded fear of being subject to regulation. In that case, we held that the plaintiff did not have standing to challenge Wisconsin's political committee registration requirements because successive advisory opinions of the Wisconsin Attorney General and regulations promulgated by the state election board already established that the definition of political committee did not apply to groups like the plaintiff. *Id.* at 1185. These formal determinations by

the state authorities meant that the plaintiff's fear of prosecution under the law was not "objectively 'well-founded,'" *id.*, quoting *American Booksellers*, 484 U.S. at 393, that the lawsuit was an attempt "to resolve a controversy that has not yet arisen and may never arise," *id.* at 1187-88, and that the plaintiff therefore lacked standing.[7]

This case is quite different for there has been no determination by any Illinois official that the Center and other such groups do not qualify as political committees under Article 9. The named defendants are the Illinois Attorney General and members of the Board of Elections. They have not denied that the Center's past out-of-state "issue ads" could qualify as electioneering communications under the Illinois disclosure laws. Unlike *Paradise*, there is a sufficiently realistic possibility that the Center would be subject to Article 9's registration and reporting requirements if it engages in the type of political advocacy it often does and wishes to in Illinois. That is

---

[7] Technically, the *Paradise* holding was on the redressability prong rather than the injury-in-fact prong of the standing rule. The only real potential threat of injury to the plaintiff came from private actors, whom the Wisconsin statute empowered to bring enforcement suits in state court against unregistered organizations that ran illegal campaign advertising. A potential injury from a decision by a state court in private litigation was not redressable by a federal court order because a state court is not required to accept an inferior federal court's determination that a statute is unconstitutionally overbroad. We therefore held that the third prong of Article III standing (redressability) was not met. *Id.* at 1187.

enough to establish that the Center has an objectively reasonable fear of being subject to Illinois's registration and reporting requirements if it engages in its intended speech, and that the Center chose to avoid those alleged burdens. "Such self-censorship in the face of possible legal repercussions suffices to show Article III injury." *National Org. for Marriage v. McKee*, 649 F.3d 34, 48-49 (1st Cir. 2011) (finding that nonprofit group had standing to challenge state disclosure laws in pre-enforcement action); accord, *Human Life of Wash. Inc. v. Brumsickle*, 624 F.3d 990, 1001 (9th Cir. 2010) (same). We find that the Center has Article III standing to challenge the constitutionality of Illinois's disclosure law.

III. *Scope of Review: Facial Challenge*

Next we must clarify the scope of the legal challenge before us. The Center describes its suit as both a facial and an as-applied challenge, arguing that Article 9 is unconstitutionally vague and overbroad "both facially and as applied to independent issue advocacy groups such as CFIF." It is true that facial challenges and as-applied challenges can overlap conceptually. See *Doe v. Reed*, 130 S. Ct. 2811, 2817 (2010) (acknowledging that plaintiffs' claim "has characteristics of both" as-applied and facial challenge); Richard Fallon, *As-Applied and Facial Challenges and Third-Party Standing*, 113 Harv. L. Rev. 1321, 1341 (2000) ("[F]acial challenges are less categorically distinct from as-applied challenges than is often thought."). But there is a difference: Where the "claim and the relief that would follow . . . reach beyond the particular circum-

stances of the[] plaintiffs," "[t]hey must . . . satisfy [the] standards for a facial challenge to the extent of that reach." *Doe v. Reed*, 130 S. Ct. at 2817 (2010).

This is not a case where a group has actually engaged in a particular form of speech that is subject to regulation and seeks to challenge the applicability of the law to itself and other groups who have engaged in similar expressive activity. Cf. *FEC v. Wisconsin Right to Life*, 551 U.S. 449 (2007) (as-applied challenge to federal statute banning electioneering communications brought by advocacy group that had run TV advertisements it believed would be covered by the statute if group continued to run them during 60-day pre-election blackout period). Here, the Center has not broadcast *any* communications in Illinois, so it would be impossible for this court to fashion a remedy tailored to its own particular speech activities and those of similar groups, for we have only a general idea of what its hypothetical broadcasts would say. The Center has not laid the foundation for an as-applied challenge here. We analyze its claims under the standards governing facial challenges.

Those standards set a high bar. In reversing a decision striking down a state election law in a facial challenge, the Supreme Court explained:

> Facial challenges are disfavored for several reasons. Claims of facial invalidity often rest on speculation. As a consequence, they raise the risk of premature interpretation of statutes on the basis of factually barebones records. Facial challenges also run contrary to the fundamental principle of judicial restraint

that courts should neither "'anticipate a question of constitutional law in advance of the necessity of deciding it'" nor "formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied." *Ashwander v. TVA*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring). Finally, facial challenges threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution.

*Washington State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450-51 (2008) (some citations, brackets, and internal quotation marks omitted). In determining whether a law is unconstitutional on its face, then, "we must be careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases." *Id.* at 450, citing *United States v. Raines*, 362 U.S. 17, 22 (1960). With these principles in view, we turn to the merits of the Center's facial challenge to Article 9. We review *de novo* the district court's treatment of the constitutional questions presented. *E.g.*, *Anderson v. Milwaukee County*, 433 F.3d 975, 978 (7th Cir. 2006).

IV. *Overbreadth and Void-for-Vagueness Claims*

The Supreme Court has recognized a particular type of facial challenge in the First Amendment context under which a law may be struck down entirely as impermissibly overbroad. Under this overbreadth doctrine, "a statute is facially invalid if it prohibits a

substantial amount of protected speech." *United States v. Williams*, 553 U.S. 285, 292 (2008). The overbreadth doctrine is "'strong medicine'" that should be "employed . . . with hesitation, and then 'only as a last resort.'" *New York v. Ferber*, 458 U.S. 747, 769 (1982), quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973). Accordingly, courts "vigorously enforce[ ] the requirement that a statute's overbreadth be *substantial*, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep." *Williams*, 553 U.S. at 292.

Since its seminal modern campaign finance decision in *Buckley v. Valeo*, 424 U.S. 1, 19 (1976), the Supreme Court has consistently distinguished between laws that restrict the amount of money a person or group can spend on political communication and laws that simply require disclosure of information by those who spend substantial sums on political speech affecting elections.[8]

---

[8] See, *e.g.*, *Citizens United*, 130 S. Ct. 876 (striking down federal ban on electioneering communications by corporations and labor unions but upholding disclosure requirements as applied to such entities); *McConnell v. FEC*, 540 U.S. 93 (2003) (striking down federal ban on political donations by minors but upholding law's disclosure provisions), overruled in part on other grounds, *Citizens United*, 130 S. Ct. at 913; *FEC v. Massachusetts Citizens for Life*, 479 U.S. 238, 262 (1986) (striking down requirement that corporations set up segregated fund for independent expenditures in connection with any federal election as applied to nonprofit advocacy group while pointing approvingly to "disclosure provisions" that will

(continued...)

Unlike contribution and expenditure limits, disclosure laws "impose no ceiling on campaign-related activities," *id.* at 64, and "do not prevent anyone from speaking*." Citizens United*, 130 S. Ct. at 914, quoting *McConnell v. FEC*, 540 U.S. 93, 124 (2003), overruled in part on other grounds, *Citizens United*, 130 S. Ct. at 913. Disclosure laws are thus a "less restrictive alternative to more comprehensive regulations of speech." *Citizens United*, 130 S. Ct. at 915. For that reason, the Court does not subject disclosure requirements to the same standard of

---

(...continued)
"provide precisely the information necessary to monitor MCFL's independent spending activity and its receipt of contributions"); *Citizens Against Rent Control v. City of Berkeley*, 454 U.S. 290, 298 (1981) (striking down ordinance capping contributions to ballot initiative committees while noting that the ordinance's disclosure requirements were alone adequate to fulfill the city's informational interest in knowing "whose money supports or opposes a given ballot measure"); *First National Bank of Boston v. Bellotti*, 435 U.S. 765, 790 n.29 (1978) (striking down Massachusetts law prohibiting corporations from making contributions or expenditures to influence the outcome of initiatives and referenda but noting: "Identification of the source of advertising may be required as a means of disclosure, so that the people will be able to evaluate the arguments to which they are being subjected."); *Buckley*, 424 U.S. at 68 (invalidating federal expenditure limits but upholding disclosure requirements, which "certainly in most applications appear to be the least restrictive means of curbing the evils of campaign ignorance and corruption that Congress found to exist").

strict scrutiny that applies to contribution and expenditure limits but rather to "exacting scrutiny," which requires only "a 'substantial relation' between the disclosure requirement and a 'sufficiently important' governmental interest." *Citizens United*, 130 S. Ct. at 914, quoting *Buckley*, 424 U.S. at 64, 66.[9] We apply exacting scrutiny to the Center's facial challenges to Article 9, examining whether the disclosure requirements are substantially related to a sufficiently important governmental interest.

In this case, the state interest at stake is that of "provid[ing] the electorate with information as to where political campaign money comes from and how it is spent." *Buckley*, 424 U.S. at 66 (internal quotation marks omitted). This "informational interest" is sufficiently important to support disclosure requirements. See, *e.g.*, *id.* at 66-67. In *Buckley*, the Court recognized that campaign finance disclosure was a critical tool for maintaining transparency in the political marketplace: "In a republic where the people are sovereign, the ability of the citizenry to make informed choices among candidates for office is essential, for the identities of those

---

[9] See also *Doe v. Reed*, 130 S. Ct. 2811, 2818 (2010) ("We have a series of precedents considering First Amendment challenges to disclosure requirements in the electoral context. These precedents have reviewed such challenges under what has been termed 'exacting scrutiny.'"); *Buckley v. American Constitutional Law Foundation, Inc.*, 525 U.S. 182, 202 (1999) ("'exacting scrutiny' is necessary when compelled disclosure of campaign-related payments is at issue").

who are elected will inevitably shape the course that we follow as a nation." *Id.* at 14-15.[10] Disclosure requirements advance the public's interest in information by "allow[ing] voters to place each candidate in the political spectrum more precisely than is often possible solely on the basis of party labels and campaign speeches." *Id.* at 67. By revealing "the sources of a candidate's financial support," disclosure laws "alert the voter to the interests to which a candidate is most likely to be responsive and thus facilitate predictions of future performance in office." *Id.*

The Supreme Court has repeatedly recognized this informational interest and the unique role that disclosure plays in furthering it.[11] Our court, too, has acknowledged the importance of disclosure regulations in providing "additional information useful to the consumer" of political messaging. *Majors v. Abell*, 361 F.3d 349, 352 (7th Cir. 2004). In *Majors*, we upheld an Indiana law requiring political ads to identify the persons who paid for them:

> The avidity with which candidates for public office seek endorsements is evidence (as if any were needed)

---

[10] See also Letter from James Madison to W.T. Barry (Aug. 4, 1822), in 9 Writings of James Madison 103 (Gaillard Hunt, ed. 1910) ("A popular Government, without popular information, or the means of acquiring it, is but a prologue to a Farce or a Tragedy; or perhaps, both. Knowledge will forever govern ignorance: And a people who means to be their own Governors, must arm themselves with the power which knowledge gives.").

[11] See, *e.g.*, cases cited above in note 8.

that the identity of a candidate's supporters — and opponents — is information that the voting public values highly. In areas of inquiry where logic or exact observation is unavailing, a speaker's credibility often depends crucially on who he is. As Aristotle said, "persuasion is achieved by the speaker's personal character when the speech is so spoken as to make us think him credible. We believe good men more fully and more readily than others: this is true generally whatever the question is, and absolutely true where exact certainty is impossible and opinions are divided."

*Id.*, quoting Aristotle, *Rhetoric*, in 2 *The Complete Works of Aristotle* 2152, 2155 (Jonathan Barnes ed. 1984); see also *Abrams v. United States*, 250 U.S. 616, 630 (Holmes, J., dissenting) ("Of course, the identity of the source is helpful to evaluating ideas."). We agree that this is a sufficiently important governmental interest to support Illinois's disclosure requirements, and we proceed below under the exacting-scrutiny framework to examine whether there is a substantial relation between Illinois's informational interest and the features of Article 9 that the Center contends are overbroad.[12]

---

[12] The state also invokes two other interests in support of Article 9, stating that disclosure laws both prevent corruption and its appearance and enable enforcement of other campaign finance laws, such as those imposing dollar limits on direct contributions to campaigns. *Buckley* recognized that disclosure requirements can advance these substantial interests, as

(continued...)

Before doing so, however, we briefly describe the Center's alternative theory, that certain provisions of Article 9 are unconstitutionally vague. Like the overbreadth doctrine, the void-for-vagueness doctrine protects against the ills of a law that "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement*." FCC v. Fox Television Stations, Inc.*, 132 S. Ct. 2307, 2317 (2012), quoting *Williams*, 553 U.S. at 304. The "vagueness doctrine addresses at least two connected but discrete due process concerns: first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *Id.*, citing *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972). In cases where the "statute abuts upon sensitive areas of basic First Amendment freedoms," *Grayned*, 408 U.S. at 108-09 (brackets omitted), "rigorous adherence to those requirements is

---

(...continued)

well. See 424 U.S. at 67-68 (concluding that "disclosure requirements deter actual corruption and avoid the appearance of corruption by exposing large contributions and expenditures to the light of publicity" and that "recordkeeping, reporting, and disclosure requirements are an essential means of gathering the data necessary to detect violations of the contribution limitations described above"). Because the informational interest is sufficient to support Illinois's laws, we do not reach whether these other interests also support Article 9.

necessary to ensure that ambiguity does not chill pro-
tected speech." *Fox Television Stations*, 132 S. Ct. at 2317.
Even under the heightened standard for the First Amend-
ment, though, the potential chilling effect on protected
expression must be both "real and substantial" to invali-
date a statute as void for vagueness in a facial challenge.
*Erznoznik v. City of Jacksonville*, 422 U.S. 205, 216 (1975).
In addition, a "plaintiff who engages in some conduct
that is clearly proscribed cannot complain of the vague-
ness of the law as applied to the conduct of others*." Village
of Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S.
489, 495 (1982).

   In sum, both the vagueness and overbreadth questions
involve the same preliminary inquiry into whether the
statute will have a substantial effect on constitutionally
protected activity: "In a facial challenge to the over-
breadth and vagueness of a law, a court's first task is
to determine whether the enactment reaches a sub-
stantial amount of constitutionally protected conduct*."
Flipside*, 455 U.S. at 494 (footnote omitted). If it does not,
then under either theory the facial challenge must fail.
In the First Amendment context, vagueness and over-
breadth are two sides of the same coin, and the two sorts
of challenges are often conceived of as "alternative and
often overlapping" theories for relief on the same claim.
*Jordan v. Pugh*, 425 F.3d 820, 827 (10th Cir. 2005)
(McConnell, J.).[13]

---

[13] See also *Kolender v. Lawson*, 461 U.S. 352, 359 n.8 (1983) ("[W]e
have traditionally viewed vagueness and overbreadth as
(continued...)

The Center has presented its overbreadth and vagueness claims as one undifferentiated argument, asserting that Article 9's provisions are both "vague and overbroad." This is not unusual, see *Human Life*, 624 F.3d at 1020, and does not call for criticism. This case does not require us to parse fine distinctions between the two theories. Whether the argument is styled as overbreadth or vagueness, the central question in this facial challenge is whether the provisions at issue potentially reach a "substantial" amount of protected speech.

Campaign finance disclosure requirements have existed at the federal level since 1910. See Campaign Expenses Publicity Act of 1910, Pub. L. No. 274, 36 Stat. 822. The modern federal disclosure regime was part of the

---

(...continued)

logically related and similar doctrines."); *Entertainment Productions, Inc. v. Shelby Cnty.*, 588 F.3d 372, 379 (6th Cir. 2009) ("When a law implicates First Amendment freedoms, vagueness poses the same risk as overbreadth, as vague laws may chill citizens from exercising their protected rights."); Richard H. Fallon, Jr., *Making Sense of Overbreadth*, 100 Yale L.J. 853, 904 (1991) ("First Amendment vagueness doctrine — as distinct from ordinary or non-First Amendment vagueness doctrine — is best conceptualized as a subpart of First Amendment overbreadth doctrine."); Note, *The First Amendment Overbreadth Doctrine*, 83 Harv. L. Rev. 844, 873 (1970) ("when the Supreme Court has spoken of the facial vagueness of statutes touching first amendment rights, it has seldom if ever been referring to a constitutional vice different from the latent vagueness of an overbroad law").

Federal Election Campaign Act of 1971 (FECA), Pub. L. No. 92-225, 86 Stat. 3, as amended by the Bipartisan Campaign Reform Act of 2002 (BCRA), Pub. L. No. 107-155, 116 Stat. 81 (2002) (codified as amended at 2 U.S.C. §§ 431-34). Because the Supreme Court has upheld FECA's disclosure requirements, we need not invent the wheel in this case. Instead, we identify the ways in which Illinois's disclosure law is broader or more vague than FECA and then consider whether each difference is constitutionally permissible. Article 9 differs from federal disclosure provisions in two significant respects. First, Article 9 extends the disclosure of expenditures and contributions to ballot initiative campaigns. Second, Article 9 regulates as a political committee any organization that exceeds the dollar-limit spending thresholds, while under federal law only those groups with the "major purpose" of influencing elections must register as political committees. In addition to these substantive differences, Article 9's definitions of several key terms — "electioneering communication," "expenditure," "contribution," and "independent expenditure" — differ slightly from their federal law analogs. We first analyze the two broader questions on ballot initiatives and the major-purpose test before turning to the statutory details.

A.  *Disclosures for Ballot Issue Campaigns*

1.  *Contributions and Expenditures*

In Illinois, individuals and groups must register as "ballot initiative committees" when they accept contribu-

tions or make expenditures in support of or in opposition to any question of public policy in amounts exceeding $3,000 in a 12-month period. 10 ILCS 5/9-1.8(e). Federal law does not provide for ballot initiatives and referenda, so FECA contains no corresponding requirements. The issue here is whether this additional feature of Article 9's disclosure regime is substantially related to Illinois's interest in maintaining an informed electorate.

Educating voters is at least as important, if not more so, in the context of initiatives and referenda as in candidate elections. In direct democracy, where citizens are "responsible for taking positions on some of the day's most contentious and technical issues, '[v]oters act as legislators,' while 'interest groups and individuals advocating a measure's defeat or passage act as lobbyists.'" *Human Life*, 624 F.3d at 1006, quoting *California Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1105 (9th Cir. 2003); see also *Doe v. Reed*, 130 S. Ct. at 2833 (Scalia, J., concurring) ("When a . . . voter signs a referendum petition . . ., he is acting as a legislator."). In an initiative campaign, "average citizens are subjected to advertising blitzes of distortion and half-truths and are left to figure out for themselves which interest groups pose the greatest threats to their self-interest*." Human Life*, 624 F.3d at 1006, quoting David S. Broder, *Democracy Derailed: Initiative Campaigns and the Power of Money* 18 (2000). Because the issues can be complex and the public debate confusing, voters' interest in knowing the source of messages promoting or opposing ballot measures is especially salient in such campaigns.

Disclosure laws are substantially related to the public's interest in information during ballot initiative campaigns. Research shows that one of the most useful heuristic cues influencing voter behavior in initiatives and referenda is knowing who favors or opposes a measure. See Elizabeth Garret & Daniel A. Smith, *Veiled Political Actors and Campaign Disclosure Laws in Direct Democracy*, 4 Election L.J. 295, 296-98 (2005); Michael S. Kang, *Democratizing Direct Democracy: Restoring Voter Competence Through Heuristic Cues and "Disclosure Plus"*, 50 UCLA L. Rev. 1141,1157 (2003).[14] Because nominally independent political operations can hide behind "misleading names to conceal their identity," *McConnell*, 540 U.S. at 128, often only disclosure of the *sources* of their

---

[14] A classic study of voting on insurance-related ballot initiatives compared three groups of voters: (1) voters who knew nothing about the initiatives' details but knew the insurance industry's preference, (2) highly informed voters who consistently gave correct answers to detailed questions about the subject matter, and (3) voters who knew nothing about the ballot question or about the insurance industry's preferences. The first two groups of voters demonstrated similar voting patterns, while the third group that was completely in the dark had very different voting patterns. The study author concluded that the position of an economic group with known preferences on an issue can serve as an effective shortcut for ordinary voters, substituting for encyclopedic information about the electoral choice. See Arthur Lupia, *Shortcuts Versus Encyclopedias: Information and Voting Behavior in California Insurance Reform Elections*, 88 Am. Pol. Sci. Rev. 63, 71-72 (1994).

funding may enable the electorate to ascertain the identities of the real speakers. See *Citizens Against Rent Control v. City of Berkeley*, 454 U.S. 290, 298 (1981) (in ballot measure campaigns, "when individuals or corporations speak through committees, they often adopt seductive names that tend to conceal the true identity of the source").[15]

The Supreme Court long ago approved Congress's authority to require federal lobbyists to make financial disclosures because "full realization of the American ideal of government by elected representatives depends to no small extent on [Congress's] ability to properly evaluate [the] pressures" to which it is regularly subjected. See *United States v. Harriss*, 347 U.S. 612, 625 (1954).

---

[15] The *McConnell* Court gave examples of a few such stealthily-named groups, including "Citizens for Better Medicare," which "was not a grassroots organization of citizens, as its name might suggest, but was instead a platform for an association of drug manufacturers." 540 U.S. at 128. Since the rise of the super PAC in the wake of *Citizens United*, the use of nondescript names by PACs acting as proxies for specific candidates has become commonplace. From their names alone, who could guess that "Priorities USA Action" and "Restore Our Future" were each formed to support one of the major candidates for president this year? Or that "Americans for a Better Tomorrow, Tomorrow" is a super PAC formed by political satirist Stephen Colbert to mock the current state of American campaign finance law? See *Colbert Super PAC SHH! — 501c4 Disclosure,* The Colbert Report (Apr. 3, 2012), *available at* http://www.colbertnation.com/the-colbert-report-videos/4116 73/april-03-2012/colbert-super-pac-shh----501c4-disclosure.

For the same reasons, when Illinois citizens "act[ ] as legislators" during initiative campaigns, see *Doe v. Reed*, 130 S. Ct. at 2833 (Scalia, J., concurring in the judgment), the State requires those who "attempt to influence legislation" being considered on the ballot to disclose a "modicum of information from those who for hire attempt to influence legislation or who collect or spend funds for that purpose" — namely, "who is putting up the money, and how much." See *Harriss*, 347 U.S. at 625. This "enables the electorate to make informed decisions and give proper weight to different speakers and messages." *Citizens United*, 130 S. Ct. at 916. Such regulation is substantially related to Illinois's interest in preserving an informed electorate. Accord, *Family PAC v. McKenna*, 685 F.3d at 811; *Human Life*, 624 F.3d at 1008.

Although the Supreme Court has not directly passed on state disclosure requirements for ballot initiatives, it has discussed such laws approvingly. See *Citizens Against Rent Control v. City of Berkeley*, 454 U.S. at 298 (striking down cap on contributions but noting that law's disclosure requirements adequately fulfilled need for information in ballot measure contests); *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 792 n.32 (1978) (striking down state law prohibiting corporate contributions or expenditures to influence referenda: "Identification of the source of advertising may be required as a means of disclosure, so that the people will be able to evaluate the arguments to which they are being subjected."); *Buckley v. American Constitutional Law Foundation, Inc.*, 525 U.S. 182, 202-03 (1999) (striking down state law requiring proponents of initiatives to report the names, addresses, and

earnings of all paid circulators, who had to wear name badges while gathering signatures; disclosure requirements remained in effect to aid voters in evaluating messages). These three cases strongly suggest that disclosure laws are substantially related to the state's informational interest in the context of ballot initiative campaigns.

To be sure, requiring disclosure in the ballot initiative context may burden First Amendment rights in two ways. First, disclosure requirements may deter contributions or expenditures by some individuals and groups who would prefer to remain anonymous. See *Buckley v. Valeo*, 424 U.S. at 68. Second, "disclosure requirements can chill donations to an organization by exposing donors to retaliation." *Citizens United*, 130 S. Ct. at 916; see, *e.g.*, *Brown v. Socialist Workers '74 Campaign Comm. (Ohio)*, 459 U.S. 87, 100 (1982) (First Amendment prohibits states from compelling disclosures of campaign finance information from minor political party where there is a "reasonable probability" that identified persons would be subject to "threats, harassment, and reprisals").

On the record in this facial challenge, however, we must treat these burdens as modest. "[D]isclosure requirements may burden the ability to speak, but they impose no ceiling on campaign-related activities, and do not prevent anyone from speaking." *Citizens United*, 130 S. Ct. at 914 (citations and internal quotation marks omitted). The burden of public identification may foreclose application of disclosure laws to individual pamphleteers, see *McIntyre v. Ohio Elections Comm'n*, 514

U.S. 334 (1995), or small neighborhood groups that raise less than $1000, see *Sampson v. Buescher*, 625 F.3d 1247 (10th Cir. 2010), for in these cases the state's interest in disseminating such information to voters is at a low ebb. See *McIntyre*, 514 U.S. at 348-49. Here, however, the Center is a far cry from the lone pamphleteer in *McIntyre*, and its broad "interest in anonymity" does not justify invalidating disclosure laws in a facial challenge brought by a national political advocacy organization that seeks to use the mass media in Illinois to spread its political messages on a broad scale. That is exactly the sort of campaign-related advertising about which Illinois has a substantial interest in providing information to its public.

Similarly, the record in this facial challenge does not support any prospect of retaliation that could bar application of Article 9. In *Doe v. Reed*, the Supreme Court upheld the constitutionality of a state law that allowed for public disclosure of petition signers' names and addresses. The Court held that disclosure of the names and addresses of petition signers would not ordinarily create a "reasonable probability" that they would be harassed. 130 S. Ct. at 2820-21, quoting *Buckley*, 424 U.S. at 74. The same result applies here. The Center has "provided us scant evidence or argument," *id.* at 2821, beyond bare speculation, that Article 9 would be at all likely to precipitate "threats, harassment, or reprisals" against it or other similarly situated advocacy groups. See *Buckley*, 424 U.S. at 74.

Article 9's application to contributions and expenditures related to ballot initiatives is substantially related to

Illinois's strong interest in maintaining an informed electorate, and this interest strongly outweighs any burdens on protected speech, at least in the absence of facts that might be offered in support of a much narrower as-applied challenge.[16]

## 2. *Electioneering Communications on Ballot Issues*

Article 9 also requires groups to register as ballot initiative committees when they spend more than $3,000 on electioneering communications that advocate for or against ballot issues. 10 ILCS 5/9-1.8(e). This provision likewise advances the state's interest in ensuring voters are informed about ballot initiatives. The Center argues that the requirement imposes significant burdens on speakers because the definition of electioneering communication does not adequately distinguish ballot initiative campaign advocacy from pure issue discussion. The Center's argument relies principally on two Supreme Court cases — *Buckley v. Valeo* and *FEC v. Wisconsin Right to Life, Inc.*, 551 U.S. 449 (2007). The *Buckley* Court upheld all of the disclosure and reporting requirements in FECA. To avoid the regulation of pure "issue discussion," though, the Court placed a narrowing construction on the term "expenditure" "to reach only funds used for communications that *expressly advocate* the election or defeat of a clearly identified candidate.*"

---

[16] The failure of the Center's "broad based challenge does not foreclose success" on a future as-applied challenge to Article 9. See *Doe*, 130 S. Ct. at 2821.

*Buckley*, 424 U.S. at 80 (footnote omitted) (emphasis added). This was the genesis of a distinction *Buckley* had earlier drawn in the context of *independent expenditures* between issue discussion and express advocacy. The latter, the Court said, would typically involve the use of unequivocal words and phrases "such as 'vote for,' 'elect,' 'support,' 'cast your ballot for, 'Smith for Congress,' . . . 'defeat,' 'reject' "— a list that has come to be known as *Buckley*'s "magic words." *Id.* at 44 n.52. For many years the Court adhered to the distinction, but it repeatedly emphasized that "the express advocacy limitation . . . was the product of statutory interpretation rather than a constitutional command." *McConnell*, 540 U.S. at 191-92; see also *Wisconsin Right to Life*, 551 U.S. at 475 n.71 (principal opinion of Roberts, C.J.) (reiterating that *Buckley*'s "magic words" definition "does not dictate a constitutional test" and the "express advocacy restriction was an endpoint of statutory interpretation, not a first principle of constitutional law").

In *Wisconsin Right to Life*, the Supreme Court's lead opinion held that the federal ban on corporate and labor disbursements for campaign-related broadcasts could be applied only to advertisements that were "express advocacy" or its "functional equivalent.*" 551 U.S. at 465, citing *McConnell*, 540 U.S. at 206. A broadcast is the "functional equivalent of express advocacy only if the ad is susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate." *Id.* at 469-70. While "[c]ourts need not ignore basic background information that may be necessary to put an ad in context," *id.* at 474 , "there generally should

be no discovery or inquiry into the sort of contextual factors" that would go to either the speaker's "subjective" intent or the likely "effect" of the ad on the electorate, *id.* at 474 n.7. The Center contends that Article 9's definition of electioneering communication is inconsistent with *Buckley* and *Wisconsin Right to Life* because it considers whether a broadcast refers to a "clearly identified question of public policy that will appear on the ballot." 10 ILCS 5/9-1.14. The Center calls this "an intent-or-effect standard that requires a judgment as to how a listener will understand speech," since the public discussion of certain policy issues could be considered discussion of a ballot question.

For two reasons, we disagree. First, *Citizens United* made clear that the wooden distinction between express advocacy and issue discussion does not apply in the disclosure context.

In *Citizens United*, which came after *Wisconsin Right to Life*, the Court explicitly rejected the plaintiff's attempt to graft the express advocacy/issue discussion dichotomy onto the constitutional law of campaign finance disclosure. 130 S. Ct. at 915. The Court reaffirmed that

> disclosure is a less restrictive alternative to more comprehensive regulations of speech. In *Buckley*, the Court upheld a disclosure requirement for independent expenditures even though it invalidated a provision that imposed a ceiling on those expenditures. In *McConnell*, three Justices who would have found § 441b to be unconstitutional nonetheless voted to uphold BCRA's disclosure and disclaimer requirements. And the Court

has upheld registration and disclosure requirements on lobbyists, even though Congress has no power to ban lobbying itself. For these reasons, we reject Citizens United's contention that the disclosure requirements must be limited to speech that is the functional equivalent of express advocacy.

*Id.* at 915 (citations omitted). Accordingly, mandatory disclosure requirements are constitutionally permissible even if ads contain no direct candidate advocacy and "only pertain to a commercial transaction." *Id.* at 915. Whatever the status of the express advocacy/issue discussion distinction may be in other areas of campaign finance law, *Citizens United* left no doubt that disclosure requirements need not hew to it to survive First Amendment scrutiny. With just one exception, every circuit that has reviewed First Amendment challenges to disclosure requirements since *Citizens United* has concluded that such laws may constitutionally cover more than just express advocacy and its functional equivalents, and in each case the court upheld the law.[17]

---

[17] See *National Org. for Marriage, Inc. v. Sec'y*, No. 11-14193, 2012 WL 1758607, at *1 (11th Cir. May 17, 2012) (unpublished opinion); *The Real Truth About Abortion, Inc. v. FEC*, 681 F.3d 544, 551-52 (4th Cir. 2012); *National Org. for Marriage v. McKee*, 649 F.3d 34, 54-55 (1st Cir. 2011); *Human Life of Wash. Inc. v. Brumsickle*, 624 F.3d 990, 1016 (9th Cir. 2010). The exception is the Tenth Circuit. In *Sampson v. Buescher*, 625 F.3d 1247 (10th Cir. 2010), the court struck down disclosure requirements as applied to a neighborhood group that had raised less than

(continued...)

Second, even if disclosure requirements were constitutionally applicable only to express advocacy and its functional equivalent, Illinois's definition of "electioneering communication" is limited by language nearly identical to that used in *Wisconsin Right to Life* to define the functional equivalent of express advocacy. Compare 10 ILCS 5/9-1.14 (the broadcast must be "susceptible to no reasonable interpretation other than as an appeal to vote for or against a clearly identified candidate, . . . a political party, or a question of public policy that will appear on the ballot"), with *Wisconsin Right to Life*, 551 U.S. at 669-70 (principal opinion) ("a court should find that an ad is the functional equivalent of express advocacy only if the ad is susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate"). Moreover, Article 9's

---

(...continued)
$1,000 to oppose annexation. In *New Mexico Youth Organized v. Herrera*, 611 F.3d 669, 677 n.4 (10th Cir. 2010), the court invalidated state disclosure requirements as applied to a nonprofit because it believed "that for a regulation of campaign related speech to be constitutional it must be unambiguously campaign related." *Herrera* was decided and argued after *Citizens United*, but briefing had been completed prior to the Supreme Court's decision. The only reference to *Citizens United* was a brief statement in a footnote that "[a]lthough that opinion left many issues unresolved, we believe that requirement — that for a regulation of campaign related speech to be constitutional it must be unambiguously campaign related standard [sic] — as it pertains to this case has not been changed." *Id.* at 677 n.4.

definition tracks BCRA's in every respect, as each is limited by the same five factors: (1) by medium,[18] (2) by total amount spent,[19] (3) temporally,[20] (4) geographically,[21] and (5) by content.[22] Although there are some differences with the federal statute's definition, which we consider below in Section IV.C, the point is that Article 9 is carefully drawn to track a definition already approved by the Supreme Court in *Wisconsin Right to Life*. Even if disclosure requirements could reach only so far as express advocacy or its functional equivalent, on its face, Article 9 regulates no more than that and so is not facially overbroad.

---

[18] Compare 2 U.S.C. § 434(f)(3)(A) ("any broadcast, cable or satellite communication"), with 10 ILCS 5/9-1.14(a) ("any broadcast, cable, or satellite communication, including radio, television, or Internet communication").

[19] Compare 2 U.S.C. § 434(f) ($10,000 triggers reporting requirements), with 10 ILCS 5/9-8.6 ($3,000 triggers reporting requirements).

[20] Compare 2 U.S.C. § 434(f)(3)(A)(i)(II) (appears within 60 days of a general election or 30 days of a primary), with 10 ILCS 5/9-1.14(a)(2) (same).

[21] Compare 2 U.S.C. § 434(f)(3)(A)(i)(III) ( "is targeted to the relevant electorate" ), with 10 ILCS 5/9-1.14(a)(3) (same).

[22] Compare 2 U.S.C. § 434(f)(3)(A)(i)(I) ("refers to a clearly identified candidate"), with 10 ILCS 5/9-1.14(a)(1) ("refers to a clearly identified candidate," "political party," or "question of public policy that will appear on the ballot") (numbering omitted).

3. *Vagueness*

The Center's final concern about Article 9's regulation of ballot initiative activity is that it is triggered by contributions or expenditures received or made "with the purpose of securing a place on the ballot for, [or] advocating the defeat or passage of" any ballot initiative, "regardless of whether petitions have been circulated or filed with the appropriate office or whether the question has been adopted and certified by the governing body." 10 ILCS 5/9-1.8(e). The Center first argues that the "in support of or in opposition to" language is vague. In *McConnell*, however, the Court found that very similar language was not unconstitutionally vague. See 540 U.S. at 170 n.64 ("The words 'promote,' 'oppose,' 'attack,' and 'support' clearly set forth the confines within which potential party speakers must act in order to avoid triggering the provision. These words 'provide explicit standards for those who apply them' and 'give the person of ordinary intelligence a reasonable opportunity to know what is prohibited.'"), quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972). This part of *McConnell* remains valid after *Citizens United*, and it forecloses the Center's argument that subsection 1.8(e)'s support/opposition language is unconstitutionally vague. Accord, *National Org. for Marriage*, 649 F.3d at 62-64 (rejecting vagueness challenge to terms "promoting," "support," and "opposition").

The Center also contends that the definition is vague because it could apply to advocacy on any issue that might one day become the subject of a ballot initiative,

and the statute "provides no guidance . . . for determining when such a policy issue becomes a regulated 'question of public policy.'" For example, a group might spend $3,000 producing an ad that denounces high sales taxes, only to find six months later that a sales tax cut will be on the ballot as an initiative. The Center argues that under Article 9, that group might be found to have violated the statute if it failed to register as a ballot initiative committee and make required disclosures.

Courts do not decide facial challenges on the basis of such speculative hypotheticals. As the district court observed, campaign-related broadcasts are considered electioneering communications only when they are made within 60 days of a general election or 30 days of a primary, "at which point it would already be known if an initiative is on the ballot." As for expenditures that are not for electioneering communications (for example, glossy mailers, bumper stickers, buttons, and other campaign paraphernalia), Article 9's definition of "ballot initiative committee" is quite plainly aimed at regulating groups that are either campaigning in favor of or against *actual* ballot measures or actively advocating or opposing placing a specific question on the ballot. We have no reason to suppose the Board would construe or enforce the provision more expansively, so we cannot say that the definition of ballot initiative committee is substantially overbroad in relation to its plainly legitimate sweep, see *United States v. Stevens*, 130 S. Ct. 1577, 1587 (2010), or that its "deterrent effect on legitimate expression is . . . both real and substantial." *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 60 (1976). Illinois's regula-

tion of expenditures for, contributions to, and electioneering communications about ballot initiative campaigns is not facially overbroad or vague.

B. *Definition of Political Committee: The "Major Purpose" Test*

The Center argues that Illinois's disclosure requirements are vague and overbroad because they regulate as political committees groups that do not have as their "major purpose" the election of a candidate. Recall that outside groups are required to register as political committees if within a 12-month period they make or receive more than $3,000 worth of contributions, expenditures, or independent expenditures for electioneering communications. See 10 ILCS 5/9-1.8, 5/9-8.6(b). The Center contends that Supreme Court precedent strictly cabins regulation of political committees to organizations that are "under the control of a candidate" or whose "major purpose" is "the nomination or election of a candidate." Article 9's political committee provision covers additional entities, and thus, the Center contends, the provision is fatally overbroad. We disagree.

Like the express advocacy/issue discussion distinction, the Center's proposed major purpose test also has its origins in *Buckley*. The *Buckley* Court reviewed FECA's reporting requirements on political committees, which the statute defined as "any committee, club, association, or other group of persons which receives contributions or makes expenditures during a calendar year in an aggregate amount exceeding $1,000." *Buckley*, 424 U.S. at

79 n.105, quoting 2 U.S.C. § 431(d) (current version at § 431(4)(A)). A parallel provision of FECA defined "contribution" and "expenditure" as the "use of money or other valuable assets 'for the purpose of . . . influencing' the nomination or election of candidates for federal office." *Id.* at 77, quoting 2 U.S.C. § 431(e), (f) (current version at § 431(8), (9)). In the context of this definition, the Court concluded that the disclosure requirements could present "vagueness problems, for 'political committee' is defined only in terms of amount of annual 'contributions' and 'expenditures,' and could be interpreted to reach groups engaged purely in issue discussion." *Id.* at 79. To avoid these line-drawing problems, the Court construed the term political committee more narrowly:

> To fulfill the purposes of the Act, [political committees] need only encompass organizations that are *under the control of a candidate* or *the major purpose* of which is the nomination or election of a candidate. Expenditures of candidates and of "political committees" so construed can be assumed to fall within the core area sought to be addressed by Congress. They are, by definition, campaign related.

*Id.* (emphasis added). The Court has referred to this narrowing construction in subsequent opinions. See, *e.g.*, *McConnell*, 540 U.S. at 170 n.64; *FEC v. Massachusetts Citizens for Life*, 479 U.S. 238, 252 n.6 (1986) (plurality opinion). The Center draws from this the conclusion that the First Amendment imposes a bright-line prohibition against applying disclosure requirements to a group whose "major purpose" is other than the nomination or election of candidates.

The argument reads *Buckley* too broadly. First, as is clear from the quoted portion, the "major purpose" limitation, like the express advocacy/issue discussion distinction, was a creature of statutory interpretation, not constitutional command. See *National Org. for Marriage*, 649 F.3d at 59 ("We find no reason to believe that this so-called 'major purpose' test, like the other narrowing constructions adopted in *Buckley*, is anything more than an artifact of the Court's construction of a federal statute."); *Human Life*, 624 F.3d at 1009-10 ("*Buckley*'s statement . . . does not indicate that an entity must have that major purpose to be deemed constitutionally a political committee.").[23] *Buckley*'s limiting construction was drawn for the statute before it, and the Supreme Court has never applied a "major purpose" test to a state's regulation of political committees. See *National Org. for Marriage*, 649 F.3d at 59.

---

[23] See also *Vermont Right to Life Committee, Inc. v. Sorrell*, ___ F. Supp. 2d ___, 2012 WL 2370445, at *15 (D. Vt. 2012) (upholding Vermont campaign finance disclosure laws and concluding that the "major purpose limiting construction was the product of a vague statute, not of the First Amendment"). But see *New Mexico Youth Organized v. Herrera*, 611 F.3d 669, 677-78 (10th Cir. 2010) (invalidating state disclosure law as applied to organization because it did not "satisfy the 'major purpose' test," which "sets the lower bounds for when regulation as a political committee is constitutionally permissible"); *North Carolina Right to Life, Inc. v. Leake*, 525 F.3d 274 (4th Cir. 2008) (concluding before *Citizens United* that state disclosure law violated the First Amendment because "an entity must have 'the major purpose' of supporting or opposing a candidate to be designated a political committee").

For four reasons, we do not think this limitation extends to Illinois's disclosure requirements. First, when *Buckley* was decided, political committees faced much greater burdens under FECA's 1974 amendments than Illinois's disclosure requirements impose. For instance, FECA then included hard limits on the size of contributions to political committees, and on how much they could contribute to other political committees. See *Buckley*, 424 U.S. at 35.[24] When regulation as a political committee entails adherence to these and other more burdensome requirements, there is more room to argue that the major purpose test might be needed under the First Amendment than when the law imposes only disclosure obligations. For instance, the Supreme Court in *Massachusetts Citizens for Life* held that a federal law prohibiting corporations from making independent expenditures except through segregated funds was unconstitutional as applied to a nonprofit political advocacy organization, but the Court expressly acknowledged that the organization could be required to comply with FECA's disclosure regime. See 479 U.S. at 262 ("These

---

[24] In Illinois's 2009 amendments to its campaign finance law, the legislature imposed hard limits on the amount political committees could accept from any one individual, entity, or other political committee. 10 ILCS 5/9-8.5(d). These limits went into effect in January 2011 but were invalidated as unconstitutional as applied to non-candidate, non-political party "political action committees." See *Personal PAC v. McGuffage*, ___ F. Supp. 2d __, 2012 WL 850744 (N.D. Ill. March 13, 2012). The state did not appeal.

reporting obligations provide precisely the information necessary to monitor MCFL's independent spending activity and its receipt of contributions. The state interest in disclosure therefore can be met in a manner less restrictive than imposing the full panoply of regulations that accompany status as a political committee under the Act."). *Massachusetts Citizens for Life* shows that there is nothing constitutionally magical about being labeled as a political committee; what matters are the burdens that attend the classification.

Second, Article 9 defines political committee more narrowly than FECA by covering only groups that accept contributions or make expenditures "on behalf of or in opposition to" a candidate or ballot initiative. This definition is more targeted to campaign-related speech than FECA's definition of contribution and expenditure, which applies to anything of value given or received "for the purpose of . . . influencing" an election. 2 U.S.C. § 431(8), (9). Again, in *McConnell*, the Court held that similar language (words such as "'promote,' 'oppose,' 'attack,' and 'support'") "provide[d] explicit standards" and was not vague. See 540 U.S. at 170 n.64. The Illinois limit of "on behalf of or in opposition to" confines the realm of regulated activity to expenditures and contributions within the core area of genuinely campaign-related transactions.

Third, as the First Circuit noted in upholding Maine's campaign finance disclosure law, application of the major purpose test would "yield perverse results." "[A] small group with the major purpose of electing a . . . state

representative that spends [$3,000] for ads could be required to register" as a political committee, while a "mega-group that spends $1,500,000 to defeat the same candidate," but spends far more on non-campaign-related activities, "would not have to register because the defeat of that candidate could not be considered the [mega-group's] major purpose." *National Org. for Marriage*, 649 F.3d at 59, quoting *National Org. for Marriage v. McKee*, 723 F. Supp. 2d at 264; see also *Vermont Right to Life Committee*, ___ F. Supp. 2d at __, 2012 WL 2370445, at *16 (noting the "peculiar results" the major purpose test would produce inasmuch as "a group that spends $1.5 MM of a total of $6 MM on promoting candidates probably would not qualify, but one that spends $1500 of a total budget of $2000 probably would").

Fourth, limiting disclosure requirements to groups with the major purpose of influencing elections would allow even those very groups to circumvent the law with ease. Any organization dedicated primarily to electing candidates or promoting ballot measures could easily dilute that major purpose by just increasing its non-electioneering activities or better yet by merging with a sympathetic organization that engaged in activities unrelated to campaigning.[25] It is easy to imagine

---

[25] See *Human Life*, 624 F.3d at 1012; *North Carolina Right to Life*, 525 F.3d at 332 (Michael, J., dissenting) (warning that major-purpose standard "effectively encourages advocacy groups to circumvent the law by *not* creating political action committees and instead to hide their electoral advocacy from

(continued...)

how implementing the kind of major-purpose test the Center advances could devolve into an administrative nightmare. The First Amendment does not require a state to build such an escape hatch into reasonable disclosure laws.[26] The Supreme Court has frequently warned of the "hard lesson of circumvention" in campaign finance regulation. *McConnell*, 540 U.S. at 165; see also *Citizens United*, 130 S. Ct. at 912; *Buckley*, 424 U.S. at 62. In political campaigns, it seems, "[m]oney, like water, will always find an outlet." *McConnell*, 540 U.S. at 224; see generally Samuel Issacharoff & Pamela S. Karlan, *The Hydraulics of Campaign Finance Reform*, 77 Tex. L. Rev. 1705 (1999).[27] Illinois's disclosure provisions attempt to reduce

---

(...continued)

view by pulling it into the fold of their larger organizational structure"). Contra *id.*, 525 F.3d at 296 (majority opinion) (rejecting dissent's warning as "hyperbolic" and stating that "the dissent fails to set forth any meaningful limit on the consignment of our most basic political speech to layer upon layer of intense regulation").

[26] The FEC applies the "major purpose" test on a "case-by-case" basis, see *The Real Truth About Abortion*, __ F.3d at __, 2012 WL 2108217, at *1, and in practice the test appears to be quite complex, see *Shays v. Federal Election Comm'n*, 511 F. Supp. 2d 19, 31 (D.D.C. 2007).

[27] At the federal level, increasingly the outlets found by campaign money are blind alleys; the hydraulics of campaign finance have propelled funds to pseudonymous super PACs and § 501(c)(4) groups. See Dan Eggen, *Behind the Ads, Faceless*

(continued...)

[27] (...continued)
*Donors*, WASH. POST, Apr. 26, 2012, at A1. By one account, in the 2010 elections less than 10% of the $75 million outside groups spent on electioneering communications came from entities that disclosed their donors. See *2010 Outside Spending, by Groups*, Center for Responsive Politics, http://www. opensecrets.org/outsidespending/summ.php?disp=O (last visited Aug. 29, 2012). And already this year, groups that do not disclose their donors have spent $172 million on television, radio, and Internet advertising. See Paul Blumenthal, *'Dark Money' Hits $172 Million in 2012 Election, Half of Independent Group Spending*, HUFFINGTON POST (July 29, 2012, 6:17pm), http://www.huffingtonpost.com/2012/07/29/dark-money-2012-election_n_1708127.html. The reason for this blind spot is that FEC regulations require corporations and labor organizations making electioneering communications to report the identities of donors giving at least $1,000 *only when* the donation "was made *for the purpose of furthering* electioneering communications." 11 C.F.R. § 104.20(c)(9) (emphasis added). While any person or entity spending at least $10,000 on electioneering communications must disclose their *spending*, unions and corporations need not disclose who has contributed to pay for these ads, "unless the donor is dumb enough specifically to direct the organization to use the money for a particular ad." Richard L. Hasen, *Show Me the Donors: What's the Point of Campaign Finance Disclosure? Let's Review*, SLATE (Oct. 14, 2010), http://www.slate.com/articles/news_and_politics/politics/2010/10/show_me_the_donors.html.

A district court recently invalidated the FEC-created loophole as an unreasonable construction of the FECA statute. See *Van Hollen v. FEC*, __ F. Supp. 2d __, 2012 WL 1066717 (D.D.C. 2012),

(continued...)

this risk of circumvention by defining political committee to include groups that either coordinate expenditures with campaigns and parties or that run ads that are unambiguous appeals to vote a particular way.

In light of these considerations, the line-drawing concerns that led the Court to adopt the major purpose limitation for contribution and expenditure limits in *Buckley* do not control our overbreadth analysis of the disclosure requirements of Article 9. Instead, as the Supreme Court has instructed in applying exacting scrutiny, our inquiry depends on whether there is a substantial relation between Illinois's interest in informing its electorate about who is speaking before an election and Article 9's regulation of campaign-related spending by groups whose major purpose is *not* electoral politics. We find that there is.

In Illinois, the voting "public has an interest in knowing who is speaking about a candidate shortly before an election," *Citizens United*, 130 S. Ct. at 915, whether that speaker is a political party, a nonprofit

---

[27] (...continued)
*stay pending appeal denied*, No. 12-5117, 12-5118, 2012 WL 1758569 (D.C. Cir. May 14, 2012) ("On the merits, intervenors fail to demonstrate a strong likelihood that the district court erred in interpreting . . . the plain text of section 201 of the Bipartisan Campaign Reform Act ('BCRA'), which requires that disclosures '*shall* contain . . . the names . . . of all contributors who contributed an aggregate amount of $1,000 or more to the person" purchasing "electioneering communications.'"), quoting 2 U.S.C. § 434(f)(2)(F).

advocacy group, a for-profit corporation, a labor union, or an individual citizen. The need for an effective and comprehensive disclosure system is especially valuable after *Citizens United*, since individuals and outside business entities may engage in unlimited political advertising so long as they do not coordinate tactics with a political campaign or political party. See *Citizens United*, 130 S. Ct. at 916 ("A campaign finance system that pairs corporate independent expenditures with effective disclosure has not existed before today. . . . With the advent of the Internet, prompt disclosure of expenditures can provide shareholders and citizens with the information needed to hold corporations and elected officials accountable for their positions and supporters."). Already in the 2012 federal elections, outside spending has approached $300 million nationwide.[28]

Amidst this cacophony of political voices — super PACs, corporations, unions, advocacy groups, and individuals, not to mention the parties and candidates themselves — campaign finance data can help busy voters sift through the information and make informed political judgments. Transparency in campaign finance allows the public to weigh the "credib[ility]" of the speaker and thus the "persuas[iveness]" of the message, and that is so "generally whatever the question is," Aristotle, *Rhetoric*, in 2 *The Complete Works of Aristotle* 2152,

---

[28] See *Outside Spending*, Center for Responsive Politics, http://www.opensecrets.org/outsidespending/index.php (last visited Aug. 29, 2012).

2155 (Jonathan Barnes ed. 1984)., quoted in *Majors v. Abell*, 361 F.3d 349, 352 (7th Cir. 2004) (upholding state statute requiring political ads to identify sponsors). Such transparency helps the public hold political speakers accountable for making false, manipulative, or otherwise unseemly ads that they might otherwise run with impunity. As Justice Brandeis observed, "Sunlight is said to be the best of disinfectants; electric light the most efficient policeman." Louis Brandeis, *Other People's Money* 62 (1933), quoted in *Buckley*, 424 U.S. at 67.

We conclude that Article 9's regulation as political committees of groups that lack the major purpose of influencing elections does not condemn the disclosure law as unconstitutionally overbroad.

### C. *"Electioneering Communication"*

In addition to its two major substantive challenges to Article 9, the Center asserts that several other provisions are facially vague and overbroad. The first is the definition of "electioneering communication," which applies to expenditures and contributions to determine whether an entity is a regulated political committee that must disclose its finances and donors. Illinois defines "electioneering communication" as:

> any broadcast, cable, or satellite communication, including radio, television, or Internet communication, that (1) refers to a clearly identified candidate . . ., clearly identified political party, or a clearly identified question of public policy that will appear on the

ballot, (2) is made within 60 days before a general election . . . or 30 days before a primary election, (3) is targeted to the relevant electorate, and (4) is susceptible to no reasonable interpretation other than as an appeal to vote for or against a clearly identified candidate . . ., a political party, or a question of public policy.

10 ILCS 5/9-1.14 (some internal numbering omitted). This definition is taken almost verbatim from the federal definition that was upheld (to the extent it triggered disclosure requirements) in *Citizens United*. Federal law defines "electioneering communication" as:

any broadcast, cable, or satellite communication which —

(I) refers to a clearly identified candidate for Federal office;

(II) is made within —

(aa) 60 days before a general . . . election candidate; or

(bb) 30 days before a primary . . . election . . .; and

(III) . . . is targeted to the relevant electorate.

. . .

. . . [A] communication which refers to a clearly identified candidate for Federal office is "targeted to the relevant electorate" if the communication can be received by 50,000 or more persons —

> . . . in the district [or state] the candidate seeks to represent . . . .

2 U.S.C.A. § 434(f)(3)(A)-(C).

The Center maintains that Article 9's definition of "electioneering communication" is vague and overbroad. The Supreme Court has already found the federal definition to be neither overbroad nor vague in the context of disclosure requirements, see, *e.g.*, *Citizens United*, 130 S. Ct. at 916, so in assessing Article 9 we focus on the ways in which the Illinois statute is broader or less precise than the federal one and then inquire whether each difference is constitutionally permissible.

There are three differences between the federal and Article 9 definitions of "electioneering communications." First, the Illinois statute covers communications related to ballot measure campaigns. We determined above that this element of Article 9 does not render the statute vague or overbroad, see parts IV.A.2 & .3, and do not repeat our analysis here. Second, Article 9 covers "Internet speech," which is not regulated by the federal statute. Third, Illinois does not limit the phrase "targeted to the relevant electorate" by reference to minimum audience size. We now address these last two differences.

### 1. *Internet Communications*

The Center contends that Article 9's regulation of certain Internet speech as electioneering communications renders it unconstitutionally broad because

Internet speech, in contrast to radio and television broadcasts, is not confined to particular audience markets or moments in time. Without firm temporal or geographic limitations, the Center argues, Article 9 potentially sweeps in an untold amount of online speech that has nothing to do with Illinois elections. The Center notes that "many Internet communications" — for example, postings on the Center's website, emails to the Center's membership distribution lists, or messages through social networking sites — "are equally accessible from almost anywhere in the world" and may even persist forever in cyber-space through the use of a so-called "Way-Back Machine" that stores web sites even after they have been removed by their creators or sponsors. The consequence, it suggests, is that "politically-oriented websites around the world must review their content before each Illinois election to identify and remove any prior posting referring to someone who now is an Illinois candidate or something that now is an Illinois ballot question." Keeping in mind that this is a facial challenge, we are not persuaded that this prospect invalidates the entire law.

First, requiring disclosure of genuinely campaign-related Internet communications undoubtedly advances Illinois's important interest in informing its voters about who is speaking before an election. In recent years, a large and growing proportion of electioneering has been occurring online. In 2008, for the first time, "more than half the voting-age population used the internet to connect to the political process during an election

cycle."[29] That portion is almost certainly higher today. By one estimate, the two major parties' presidential campaigns will spend $159 million more on web ads in 2012 than in 2008 — a sevenfold increase.[30] Thanks to advanced Internet marketing strategies, campaigns and other political actors have now "acquired the technical capacity to target Web ads with the precision of mail or a door-to-door canvass."[31] Campaigns, parties, and advocacy groups have increasingly turned to the Internet to reach the electorate with campaign messages, and Illinois voters have just as much a stake in knowing who is behind such messages as when they are broadcast in traditional media.

On the other hand, we agree with the Center that the *potential* reach of Illinois's disclosure law could be problematic if distant speakers were actually subject to regulation because their Internet postings inadvertently

---

[29] Aaron Smith, *The Internet's Role in Campaign 2008* 3 (Pew Internet & Amer. Life Project, Apr. 2009), *available at* http://pewresearch.org/pubs/1192/internet-politics-campaign-2008.

[30] See *Obama Outspends Romney on Online Ads*, CNN (June 3, 2012), http://www.cnn.com/2012/06/03/politics/online-campaign-spending/index.html.

[31] Sasha Issenberg, *The Creepiness Factor*, SLATE (Apr. 26, 2012), http://www.slate.com/articles/news_and_politics/victory_lab/2012/04/web_based_political_ads_why_they_scare_the_obama_and_romney_campaigns.html.

or obliquely coincided with the subjects of Illinois ballot measures. The state's interest in informing its voters of the identities, financial outlays, and funding sources of such marginal political messengers does not rise to the importance the First Amendment demands. Yet the Center has identified no case in which the State Election Board has asked out-of-state speakers to register as political committees for disseminating emails, tweets, zombie web pages, or any other Internet communications that merely mentioned Illinois candidates or discussed issues related to Illinois ballot measures. Nor could the Board legally do so, for under Article 9 Internet ads count as electioneering communications only when they are both "targeted to the relevant [Illinois] electorate" and "susceptible to no reasonable interpretation other than as an appeal to vote for or against a clearly identified candidate . . ., a political party, or a question of public policy." 10 ILCS 5/9-1.14. The Center's notion that the Board might consider an out-of-state advocacy group's web ad generally endorsing low taxes to be an unambiguous appeal to vote for a "ballot question to balance the Illinois budget" sounds far-fetched.

With no evidence that the Board would actually construe Article 9 in this surprising way, such remote, hypothetical applications do not justify invalidating Illinois's disclosure provisions for facial overbreadth. See *Washington State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008) ("[W]e must be careful not to go beyond the statute's facial requirements and specu-late about 'hypothetical' or 'imaginary' cases."), quoting

*United States v. Raines*, 362 U.S. 17, 22 (1960); see also Robert Bork, *The Tempting of America* 169 (1990) ("Judges and lawyers live on the slippery slope of analogies; they are not supposed to ski it to the bottom."). For a facial challenge to prevail, a statute's overbreadth must be "*substantial*, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep." *United States v. Williams*, 553 U.S. 285, 292 (2008). Cf. *Yazoo & Mississippi Valley R.R. Co. v. Jackson Vinegar Co.*, 226 U.S. 217, 220 (1912) ("How the state court may apply [a statute] to other cases, whether its general words may be treated as more or less restrained, and how far parts of it may be sustained if others fail are matters upon which we need not speculate now."). Neither the Board nor Illinois courts have had "occasion to construe the law in the context of actual disputes arising from the electoral context, or to accord the law a limiting construction to avoid constitutional questions." *Washington State Grange*, 552 U.S. at 450. It would be premature for this court to presume that the Board would disregard the obvious limits of the statutory text and seek to apply Article 9 in such a sweeping fashion.

The Center complains that it is too difficult to know when an "electioneering communication" is "made" on the Internet. Timing is important because of the duties that apply during the 30-day and 60-day windows before elections. See 10 ILCS 5/9-1.14(a). The district court and the defendants assert that a communication is "made" on a website both when it is first posted and while it remains available on the website. That is a sensible reading, just as a physical billboard is considered a com-

munication made by the advertiser as long as it is displayed. The Center wonders if it would still be responsible for later communications (within the 30-day and 60-day windows) if others copy its ads and post them on other websites. If that happens, the Center would not be "making" those later communications and would not be responsible for them.

We do not anticipate that Article 9 will restrict or chill a substantial amount of protected speech because it treats certain Internet speech as electioneering communications. On its face, this element of the statute is neither vague nor overbroad.

### 2. *Targeted to the Relevant Electorate*

Article 9 does not numerically define "target[ing] the relevant electorate" as does FECA, which requires that the communication be capable of being "received by 50,000 or more persons." 2 U.S.C. § 434(f)(3)(C). Illinois has good reasons for omitting a number. Its elections involve much smaller electorates, and it does not have an agency like the Federal Communications Commission that would let it monitor how large an audience a given broadcast reaches. This difference does not defeat Illinois's substantial interest in informing its electorate for the purposes of this facial challenge. In adjudicating facial challenges, federal courts do not assume that state officials will construe state law in the most expansive way imaginable. On the contrary, it "is reasonable to assume . . . that a state court presented with a state statute . . . will attempt to construe the statute

consistently with constitutional requirements." *City of Akron v. Akron Ctr. for Reproductive Health, Inc.*, 462 U.S. 416, 441 (1983), overruled in part on other grounds by *Planned Parenthood v. Casey*, 505 U.S. 833, 881-83 (1992) (as stated in plurality opinion). We agree with the state that a "reasonable, and constitutional construction of 'targeted to the relevant electorate' means a broadcast communication receivable within the geographical area where potential voters on that candidate or issue live." The absence of a numeric baseline does not condemn the phrase "targeted to the relevant" as facially invalid. Article 9's definition of "electioneering communications" is not facially vague or overbroad.

D.  *Contribution and Expenditure*

Article 9 defines "contribution" as a "gift . . . or anything of value, knowingly received in connection with the nomination for election, election, or retention of any candidate or person to or in public office or in connection with any question of public policy." 10 ILCS 5/9-1.4(A)(1). "Expenditure" means "gift of money, or anything of value, [made] in connection with the nomination for election, election, or retention of any person to or in public office or in connection with any question of public policy." 10 ILCS 5/9-1.5(A)(1). The "transfer of funds by a political committee to another political committee" automatically qualifies as a contribution (for the transferee) and an expenditure (for the transferor). 10 ILCS 5/9-1.5(A)(3), 5/9-1.4(A)(3). An expenditure "made in cooperation, consultation, or concert with another

political committee" is considered a contribution to that committee. 10 ILCS 5/9-1.4(A)(5). The Center challenges three aspects of these definitions as unconstitutionally vague.

1. *In Connection With, Supporting, or Opposing*

First, the Center argues that the requirement that a contribution or expenditure be "in connection with" an election or ballot initiative is "so vague and broad as to provide no meaningful guidance." By itself, the "in connection with" language would be of little help. But as the district court correctly observed, the scope of the "contribution" and "expenditure" definitions is further limited by the narrower definition of "political committee," which applies only to contributions or expenditures that are made "on behalf of or in opposition to a candidate" (for political action committees) or made "with the purpose of securing a place on the ballot for [or] advocating the defeat or passage of . . . the question of public policy" (for ballot initiative committees). 10 ILCS 5/9-1.8(d), (e). The only regulatory consequence of a transaction qualifying as a contribution or expenditure is when it triggers registration requirements for political committees, so the more circumscribed language in that latter provision is what matters for the vagueness analysis. Following *McConnell*, we concluded above that the "in support of or opposition" language in the definition of "ballot initiative committee" is clear enough. See part IV.A.3. The same goes for the "on behalf of or in opposition to a candidate" language in the definition

of "political action committee." All of these definitions "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited." *Grayned*, 408 U.S. at 108.

   2.  *Transfer of Funds from One Political Committee to Another*

Next, the Center attacks Article 9's treatment of any "transfer of funds by a political committee to another political committee" as a contribution or expenditure. The Center claims this provision may apply to transfers with groups that *qualify* as political committees under the statute but have not yet *registered*, so it requires people "to judge whether a source or recipient of funds may later be judged to have made a $3,000 contribution, expenditure, or otherwise became a political committee." Thus, the Center fears, it "could find itself classified as an Illinois political committee depending on how regulators later assess some other group's speech or other activities that [the Center] could not have known about." This result seems highly unlikely because it overlooks an important aspect of the transfer of funds provisions. A transfer counts as a contribution and expenditure only if it is already between two entities that *each* qualify as political committees. See 10 ILCS 5/9-1.4(A)3 and -1.5(A)(3). That makes sense only if they each already qualify as political committees independent of the particular transfer. The transfer to or from some other entity that is a political committee would not make the other entity a political committee. (Otherwise, for

example, a contractor who produced an ad attacking a candidate for a political committee would itself be transformed into a political committee.) The mere possibility that the Board might enforce the statute in such an unfair way as the Center says it fears is a good example of the sort of "hypothetical or imaginary" situation with which courts do not concern themselves in facial challenges. *Washington State Grange*, 552 U.S. at 450. If the Board sought to enforce Article 9 as the Center says it fears, that might well provide a strong basis for an as-applied challenge.

### 3. *Coordinated Expenditures*

Finally, the statute treats as a contribution any "electioneering communication made *in concert or cooperation with* or at the *request, suggestion, or knowledge* of a candidate, a political committee, or any of their agents." 10 ILCS 5/9-1.4(A)(1.5) (emphases added). The Center contends that the italicized words are vague because they do not specify the "degree of actual agreement required." Since before *Buckley*, however, FECA has provided that "expenditures made by any person in cooperation, consultation, or concert, with, or at the request or suggestion of, a candidate, his authorized political committees, or their agents, shall be considered to be a contribution to such candidate." 2 U.S.C. § 441a(a)(7)(B)(i); see *Buckley*, 424 U.S. at 46. With the exception of the word, "knowledge," Article 9's definition of coordination is no less clear than the federal definition, which has long passed muster in the Supreme Court. See, *e.g.*, *McConnell*, 540

U.S. at 219-23. We therefore reject the Center's argument that the terms, "in concert or cooperation with," "request," and "suggestion," are unconstitutionally vague.

As for the word "knowledge," we agree with the Center that standing alone, it would sweep in a wide range of expenditures as coordinated expenditures (and thus as indirect contributions to campaign committees). For instance, if a candidate learned that an outside group had produced a favorable TV ad, would the candidate have "knowledge" that the electioneering communication was made? This would not be enough to say that the ad was coordinated with the campaign. Recognizing this problem, the district court adopted the limiting construction that "affirmative acquiescence is required, not mere after the fact knowledge that the advocacy has occurred." Although we are somewhat puzzled by the phrase "affirmative acquiescence," we think the main thrust of this limiting construction is sound. Under the canon of *noscitur a sociis*, the fact that "several items in a list share an attribute counsels in favor of interpreting the other items as possessing that attribute as well*.*" *Beecham v. United States*, 511 U.S. 368, 371 (1994). Thus, the Illinois legislature's placement of "knowledge" in a series after "request" and "suggestion" indicates that we should interpret the last, more general word, to be similar to its more specific neighbors.[32] Both "request"

---

[32] This construction is especially appropriate given that the "knowledge" requirement is omitted from an otherwise

(continued...)

and "suggest" necessarily imply actual prior communication between the purchaser of the electioneering communication and the candidate, committee, or an agent thereof. The use of the term "knowledge" is clearly intended to ensure that coordination cannot be achieved by a proverbial "wink and nod," such as where the supposedly independent group gives a candidate's campaign advance, secret notice of its planned advertising campaign to attack the opponent in a particular way, but without actually drawing an explicit response from the candidate's campaign.[33]

In the context of "request" and "suggest," the word "knowledge" may fairly be construed as requiring advance and non-public communication with the candi-

(...continued)

parallel provision of Article 9 defining "independent expenditure." See 10 ILCS 5/9-1.15 (defining "independent expenditure" as an expenditure for electioneering communication "that is not made in connection, consultation, or concert with or at the request or suggestion of the public official or candidate, . . ., political committee, . . . campaign, . . . or [any] agent [thereof]").

[33] For example, the FEC's regulations on coordinated expenditures state that the definition "is not satisfied if the information material to the creation, production, or distribution of the communication was obtained from a publicly available source," but that "[a]greement or formal collaboration between the person paying for the communication and the candidate . . . is not required." 11 C.F.R. § 109.21(d)(2), (e).

date or entity on whose behalf the electioneering communication is supposedly made. Where an otherwise ambiguous provision is readily susceptible to a limiting construction that cures the vagueness concerns, we should adopt it. See *Buckley*, 424 U.S. at 77-78 ("Where the constitutional requirement of definiteness is at stake, we have the further obligation to construe the statute, if that can be done consistent with the legislature's purpose, to avoid the shoals of vagueness."). Accordingly, we interpret "knowledge" in light of its adjacent terms and conclude that the coordination language of Article 9 is clear enough to provide a reasonably intelligent person "fair warning" of what sort of conduct is covered. See *Grayned*, 408 U.S. at 108.

### E. *Independent Expenditures*

An "independent expenditure" is an expenditure for an electioneering communication or any form of express advocacy that is not coordinated with a candidate or a campaign.[34] Unlike coordinated expenditures, an

---

[34] Article 9 defines "independent expenditure" as "any payment, gift, donation, or expenditure of funds (i) by a natural person or political committee for the purpose of making electioneering communications or of expressly advocating for or against the nomination for election, election, retention, or defeat of a clearly identifiable public official or candidate or for or against any question of public policy to be submitted to the voters and (ii) that is not made in connection, consultation,

(continued...)

"independent expenditure is not considered a contribu-
tion to a political committee." 10 ILCS 5/9-8.6(a). When,
however, in a 12-month period a person or organization
makes more than $3,000 worth of independent expendi-
tures "supporting or opposing a public official or candi-
date," 10 ILCS 5/9-8.6, this triggers Article 9's disclosure
requirements.[35] The Center contends that the phrase
"supporting or opposing a public official or candidate" is
impermissibly vague because the "supporting or op-
posing" language is unclear, and because the provision
appears to apply to advocacy for or against public
officials who are not candidates.

---

(...continued)

or concert with or at the request or suggestion of the public
official or candidate, the public official's or candidate's desig-
nated political committee or campaign, or the agent or agents
of the public official, candidate, or political committee or
campaign." 10 ILCS 5/9-1.15.

[35] After exceeding the threshold, any natural person making
such independent expenditures "must file a written disclosure
with the State Board of Elections within 2 business days . . .
identify[ing] the natural person, the public official or candidate
supported or opposed, the date, amount, and nature of each
independent expenditure, and the natural person's occupa-
tion and employer." 10 ILCS 5/9-8.6(a). "Any entity other than
a natural person that makes expenditures of any kind in an
aggregate amount exceeding $3,000 during any 12-month
period supporting or opposing a public official or candidate
must organize as a political committee" and "report all
such independent expenditures as required under" Article 9.
10 ILCS 5/9-8.6(b), (c).

First, the "supporting or opposing" language has no effect on the scope or substance of these independent expenditure reporting requirements. Not just any unco-ordinated campaign-related expenditure is an "independent expenditure" — only those made either (1) for "elec-tioneering communications" or (2) for "expressly ad-vocating for or against the . . . election . . . or defeat of a clearly identifiable public official or candidate." 10 ILCS 5/9-1.15. Recall that a broadcast counts as an elec-tioneering communication only if it "refers to a clearly identified candidate" and is "susceptible to no reasonable interpretation other than as an appeal to vote for or against" that candidate. 10 ILCS 5/9-1.14(a). This standard — as well as the standard for express advocacy — is much more demanding than the requirement that ex-penditures merely be "supporting or opposing a public official or candidate." When the multiple statutory terms and definitions are assembled, then, the "supporting or opposing" language is redundant and does not render the definition of "independent expenditure" unconstitu-tionally vague or overbroad. See *Human Life*, 624 F.3d at 1021 ("otherwise imprecise terms may avoid vagueness problems when used in combination with terms that provide sufficient clarity"), quoting *Gammoh v. City of La Habra*, 395 F.3d 1114, 1120 (9th Cir. 2005).

As for the phrase "public official," we agree with the Center that a strictly literal interpretation of the provi-sion would include independent expenditures made for "expressly advocating for or against the . . . election or defeat of a clearly identifiable public official" who is not currently a candidate, but who may run for re-election

in some future year.[36] It is clear, however, from both the text of this section and Article 9 as a whole, which repeatedly refers to incumbent candidates as "public officials," that the legislature intended the phrase "public official" in section 9-8.6 to mean a public official who is also a candidate. That is the limiting construction the district court adopted, and it is a sound one. So narrowed, the provision of Article 9 imposing disclosure requirements for "independent expenditures" is not vague or overly broad.

### Conclusion

"Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs. This of course includes discussions of candidates, . . . and all such matters relating to political processes." *Mills v. Alabama*, 384 U.S. 214, 218-19 (1966). The First Amendment helps to ensure that our "constitutionally protected 'discussion of governmental affairs' is an informed one." *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 605 (1982), quoting *Mills*, 384 U.S. at 218. Campaign finance disclosure requirements can advance the democratic

---

[36] It could not apply to expenditures made for "electioneering communications," of course, because these require reference to a "clearly identified *candidate"* and an unambiguous "appeal to vote" for or against that candidate. 10 ILCS 5/9-1.14(a) (emphasis added).

virtues in informed and transparent public discourse without impairing other First Amendment values.

Although "disclosure is a less restrictive alternative to more comprehensive regulations of speech," *Citizens United*, 130 S. Ct. at 915, we are not unmindful of the costs it may generate in foregone speech from those who wish to remain anonymous, in the loss of privacy, and from social friction. See, *e.g.*, *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334 (1995) (striking down state law requiring identification of authorship on all campaign-related publications as applied to distribution of unsigned leaflets by individual pamphleteer); see generally Symposium, *Privacy, Democracy, and Elections*, 19 Wm. & Mary Bill Rights J. 857 (2011). We also take the Center at its word that its donors are so adamant about remaining anonymous that subjecting it to the Illinois reporting requirements will deter it from engaging in its preferred form of public advocacy. That is regrettable, but it is the Center's and its donors' choice to make. As Justice Scalia has written, participation in the political process takes "civic courage, without which democracy is doomed." *Doe v. Reed*, 130 S. Ct. at 2837 (Scalia, J., concurring in the judgment). While there is also a "respected tradition of anonymity in the advocacy of political causes" in this country, see *McIntyre*, 514 U.S. at 343, that tradition does not mean voters must remain in the dark about "who is speaking about a candidate shortly before an election." *Citizens United*, 130 S. Ct. at 915. Campaign finance disclosure laws must strike a balance between protecting individual speakers from invasions of privacy and harassment on the one hand,

and enabling transparency and accountability in political campaigns on the other. Illinois's laws do so sufficiently to survive this facial challenge.

The judgment of the district court is AFFIRMED.

POSNER, *Circuit Judge*, concurring in part and dissenting in part. I agree with much in the majority opinion, but several provisions of the Illinois statute seem to me to burden the plaintiff's freedom of speech unduly; we should invalidate them.

The Center for Individual Freedom is a nonprofit organization engaged in public advocacy. It makes advertisements and disseminates them in television, print, online, and other media; it maintains a website; and it produces a radio show. It conducts some of its activities during election campaigns, often commending to the electorate candidates whom it thinks likely if elected to support the policies it advocates. But it is not affiliated with and does not coordinate its activities with any candidate, campaign, or political party and is thus an "independent" advocacy group within the meaning of *Citizens United v. Federal Election Commission*, 130 S. Ct. 876, 910 (2010), and *Buckley v. Valeo*, 424 U.S. 1, 45-47 and n. 53 (1976) (per curiam). It therefore is not subject to all the reg-

ulations that states are allowed to impose on political committees that are affiliated with candidates, campaigns, or parties. A state is permitted, however, to compel public disclosure of election-related activities of independent groups, on the theory that such disclosure helps the electorate evaluate candidates for public office, *id.* at 66, 81, though a state may not limit donations to an independent advocacy organization or the expenditures that such an organization can make, or ban its speech. See *SpeechNow.org v. Federal Election Commission*, 599 F.3d 686, 694-96 (D.C. Cir. 2010) (en banc).

Illinois regulates what it calls "political committees," and the term includes not only partisan committees but also any independent organization or individual that "accepts contributions or makes expenditures during any 12-month period in an aggregate amount exceeding $3000 on behalf of or in opposition to a candidate or candidates for public office" or "in support of or in opposition to any question of public policy to be submitted to the electors," or that "makes electioneering communications," exceeding the monetary threshold, that are "related to" a candidate or to a question of public policy. 10 ILCS 5/9-1.8(d), (e). A "contribution" is among other things "anything of value that constitutes an electioneering communication made in concert or cooperation with or at the request, suggestion, or knowledge of a candidate, a political committee, or any of their agents," or "a transfer of funds received by a political committee from another political committee." 10 ILCS 5/9-1.4(A)(1.5), (3). An "expenditure" is anything of value given "in connection with the nomination for

election, election, or retention of any person to or in public office," 10 ILCS 5/9-1.5(A)(1), or "that constitutes an electioneering communication made in concert or cooperation with or at the request, suggestion, or knowledge of a candidate, a political committee, or any of their agents." 10 ILCS 5/9-1.5(A)(2). And finally an "electioneering communication" is any broadcast, cable, satellite, or Internet communication that refers to a "clearly identified candidate," "clearly identified political party," or "clearly identified question of public policy that will appear on the ballot," provided that the communication is made within 60 days before a general election or 30 days before a primary election, is "targeted to the relevant electorate," and "is susceptible to no reasonable interpretation other than as an appeal to vote for or against a clearly identified candidate…or a question of public policy." 10 ILCS 5/9-1.14(a).

A political committee must register with the Illinois Board of Elections, 10 ILCS 5/9-3(a), and file quarterly reports that open its finances to public scrutiny. For each report must reveal "all financial activity," as the state website puts it (Illinois State Board of Elections, "Political Committee Report Filing Forms," http://elections.il.gov/ CampaignDisclosure/PoliticalCommittee.aspx (visited Aug. 23, 2012)), in the previous quarter—must reveal the total contributions it received, along with all other receipts, and the total expenditures it made, including investments and loans; along with the names, addresses, and other identifying details of donors, and of recipients of the committee's expenditures. 10 ILCS 5/9-10(b), -11(a).

Having to disclose the names of donors is the most onerous requirement that the statute imposes on a political committee because many donors don't want to be publicly identified as contributing to an organization engaged in public advocacy regarding issues of public policy, which usually are controversial. Indeed CIF alleges without contradiction that its donors require assurances that their identities will not be disclosed, and that this anonymity is a condition of their support. So CIF very much does not want to be classified as a political committee and one way to avoid that fate is to avoid any activity that might, even if there is no certainty that it would, require CIF to register.

The vagueness of a number of key provisions of the Illinois law is therefore worrisome. A vague statute can deter lawful activity. Cautious persons will want to avoid even a small probability of being found to have violated it, and the safest way to do that is to avoid lawful activity that is just across the line from the unlawful—to create a buffer zone around the statutory core, just as cautious men decide not to have sex with young-looking women who probably are not below the age of consent but may be. When the lawful activity likely to be deterred by a vague statute is not extramarital sex but the exercise of free speech—a right at the apex of modern constitutional solicitude—a finding of vagueness is apt to doom the statute. *FCC v. Fox Television Stations, Inc.*, 132 S. Ct. 2307, 2317-18 (2012). The vague provisions in the Illinois election statute may cause CIF to refrain from constitutionally protected

advocacy that the state has no power to regulate because the advocacy could not influence an election.

Nor can a federal court make a binding interpretation of a state statute, endeavoring to trim its vague provisions; if it attempts a narrowing interpretation that deviates widely from the statute's apparent meaning it is taking a big risk that the state will reject the interpretation. *Stenberg v. Carhart*, 530 U.S. 914, 944-45 (2000). That risk will in turn operate as a deterrent to the advocacy group's relying on the federal court's interpretation. With an election looming, advocacy groups can't wait for the Supreme Court of Illinois to interpret all the vague provisions of the election statute in cases instituted in the state court system that are likely to take years to reach and be decided by the state's highest court.

These are the vague provisions:

1. A transfer of funds from a political committee to a political committee qualifies as a contribution regardless of amount. A political committee must report all receipts, not just contributions as defined by the statute, see 10 ILCS 5/9-11(a)(10), and in addition must report "the name and address of each political committee from which the reporting committee received, or to which that committee made, any transfer of funds." 10 ILCS 5/9-11(a)(6). So if by virtue of other contributions or other activities CIF were to be classified as a political committee, it would have to identify any other political committees from which it received money. It might not *know* a donor was a political committee, and that would

be no defense, because the statute does not require knowledge or even suspicion that the transferor is a political committee—there is no state of mind requirement at all. The transferee would have to investigate the financial activity of each donor (including an individual, who as a "natural person" can constitute a political committee) to determine whether the donor was a political committee. It might be a committee that had improperly failed to register; that would be no defense. Yet it would be afraid to list a donor as a political committee unless confident that it was one, as otherwise it might get into trouble with the donor. Damned if it does, damned if it doesn't.

An unregistered entity doesn't have to disclose its contributions and expenditures, so it would rarely be clear whether an entity qualified as a political committee. Very little of the information required to determine the status of a donor is public. This is an additional reason why advocacy groups like CIF might forgo donations from unfamiliar donors. But by reducing the group's resources, this cautious response to the vagueness of the statute would curtail its advocacy.

An alternative reading of the "transfer of funds" provision is that receipt of money from a political committee *makes* the recipient a political committee. Illinois may have been concerned that interest groups would transfer money in chains ending with a committee that didn't have to register; to target those chains and thus close a potential loophole in the statute, the Illinois courts might read the statute to reach all members of the

chain. This interpretation would have an even greater tendency to discourage an advocacy group from accepting donations from unfamiliar individuals or organizations.

2. Any "electioneering communication" made with the "knowledge" of a candidate is an expenditure that if it exceeds the low statutory threshold makes the advertiser a political committee. The word "knowledge" can't be interpreted to require that the advertiser have communicated with the candidate, because knowledge can be acquired in other ways. My colleagues think the Illinois courts would interpret the word "knowledge," which appears at the end of the sequence "request, suggestion, and knowledge," to mean the same thing as the two preceding words because it is the "more general word." But it's no more general than the other words; the three words are simply different from one another. It's not like a statute that refers to "automobiles, trucks, tractors, motorcycles, and other motor-powered vehicles"; in that sequence "motor-powered vehicles" is indeed more general than the itemized examples, but presumably not intended to be so encompassing a catchall as to include airplanes, since all the preceding terms in the sequence denote different forms of land-based transportation. Cf. *McBoyle v. United States*, 283 U.S. 25 (1931) (Holmes, J.).

So an organization that wanted to avoid crossing the $3000 threshold would if cautious refrain from broadcasting ads entirely, rather than just avoid coordinating their ads with the candidate.

The district judge was troubled by this provision and to save it interpreted "knowledge" to mean "affirmative acquiescence." But what does that mean? That the candidate was delighted to learn of an ad that praised him or a policy he was pushing?

3. If an "electioneering communication" is deemed to be "made" whenever a user accesses a website, cf. *Flava Works, Inc. v. Gunter*, No. 11-3190, 2012 WL 3124826, at *7 (7th Cir. Aug. 2, 2012), then even an appeal to vote that is posted more than 30 or 60 days before the election (depending on whether it is a primary or a general election) will constitute an expenditure that, if it exceeds the modest threshold in the statute, will make the communicator a political committee and thus require it to register. A television advertiser controls the dates on which his ad is shown; but an Internet ad or web posting remains online and accessible until removed. The advertiser may delete the ad from his website, but it may already have been copied and posted on a hundred other websites. Should the advertiser be thought to be continuing to make an electioneering communication by failing to ensure that his ad posted during the safe harbor periods is no longer accessible to voters? And how can he do that? On these critical questions, the statute is silent. The only sure way to avoid having to register as a political committee is therefore to avoid endorsing an Illinois candidate online at any time.

The Illinois courts might interpret "made" to refer only to the original posting of the ad. But this would open up a loophole; the advocacy group might have posted the

ad shortly before the 30- or 60-day cutoff and deleted it just before the cutoffs, confident that the campaign favored by the ad would copy it and post it so that it would be seen right up to election day. Because the state courts might well decide to close this loophole by interpreting "made" to include the initial posting, advocacy groups would be running a legal risk by posting online ads even long before the date of the election, and might therefore be deterred from doing so.

4. Any payment "in connection with" an election (including payment for ads) counts as an expenditure. "In connection with" could apply to communications not made for the purpose of influencing the election, such as speech on issues of policy that happen to be salient in the campaign. An advocacy group might intend its message to reach a wider audience. It might even be advocating a position embraced by neither candidate. Disclosure of such a group's finances would not be closely related to the state's interest in informing the electorate about a candidate's supporters. Yet the statute may require it.

Speech can have all sorts of connections to an election: it may mention an election, describe a candidate and his positions, or simply refer to a policy that is at issue in the campaign. A dry discussion of economic indicators might be seen as being "in connection with" an election in which the main issue was economic policy. Because disclosure requirements are not constitutionally limited to express advocacy for a candidate, see *Citizens United v. Federal Election Commission*, *supra*, 130 S. Ct. at 915,

there is no telling how far Illinois's definition reaches into the realm of issue advocacy. Once again, to be sure of not having to register, an organization like CIF might decide to avoid speaking about any policy issues during election campaigns. It might go silent during campaigns.

5. Expenditures made "in connection with" an election count towards the $3000 threshold for registering only if they are made "on behalf of or in opposition to" a candidate, and that might seem to take care of the concerns I just expressed with respect to "in connection with." But speech supporting or opposing a policy associated with a candidate could be seen as being on behalf of or in opposition to that candidate, especially if the policy is the candidate's signature issue. The term thus does not clearly exclude most issue advocacy, and groups such as CIF might therefore avoid speaking on issues that could be associated with a particular candidate. Imagine a single-issue candidate: a songbird enthusiast, he wants the owners of cats to be forbidden to allow their pets out of doors, since cats, indifferent to avian beauty and melody, kill birds for food and sport. If the humane society buys ads that declare its passionate support for the songbirds, isn't there a sense in which it is advocating for the election of the songbirds' candidate and therefore making an expenditure on his behalf and in opposition to his opponent? Or should "on behalf of" be interpreted to mean motivated by a desire to help the candidate rather than the cause the candidate supports? Who knows?

*McConnell v. Federal Election Commission*, 540 U.S. 93, 170 n. 64 (2003), overruled on other grounds in *Citizens United v. Federal Election Commission*, *supra*, held that a federal law that contained the words "promotes," "supports," "attacks," and "opposes" was not vague; and the phrase "on behalf of or in opposition to" is similar. But the federal law involved speech referring to particular candidates and made by state political parties the actions of which are presumed to be coordinated with candidates. The Illinois law applies to all who want to speak on public issues but furnishes no clue to how related to a candidate's position their speech must be to trigger the disclosure requirements. The statute is not limited to groups that coordinate their activity with a candidate or expressly advocate for him. And it is not, as in the counterpart federal statute, 2 U.S.C. § 431(8)(A)(i), limited to speech made "for the purpose of influencing" an election, since there is no state of mind limitation in the Illinois statute, so no basis for using purposiveness to limit relatedness.

The more arbitrary the meaning that must be assigned to a state statute to avoid constitutional problems, the less confident we can be that the state courts would adopt it. If independent advocacy groups share these doubts, caution may make them steer well clear of the statutory conditions for having to register as a political committee, with all the burdens entailed by registration.

When the five vague statutory provisions that I have been discussing are considered in combination, it becomes apparent that their cumulative effect on advocacy by CIF and similar organizations could be considerable.

To avoid the burden of registration, such groups may take measures to curb their advocacy even if those measures may not in fact (that is, in law) be required in order to avoid having to register. That is the vice of vagueness—that it causes an organization or an individual to give a law a wide berth, in this instance by forgoing constitutionally protected speech. We should insist, in the name of the First Amendment, that the Illinois legislature speak with greater clarity.